JEWETT, ET AL. v. SCHOOL DISTRICT NO. 25 IN FREMONT COUNTY

(No. 1976; February 11, 1936; 54 Pac. (2d) 546)

For the appellants there was a brief and the cause was argued orally by *F. B. Sheldon, Jr.,* of Riverton, Wyoming.

For the respondent there was a brief and the cause was argued orally by *Donald Spiker,* of Riverton.

BLUME, Justice.

This is an action by the plaintiffs in their own behalf and other tax payers to enjoin the board of trustees of School District No. 25, of Fremont County, Wyoming, from issuing certain bonds hereinafter mentioned. A demurrer to the petition was sustained, and from a judgment thereon, the plaintiffs have appealed. The petition discloses the following facts:

The defendant is a school district duly organized under the laws of this state. On October 1, 1935, the board of trustees of the district adopted a resolution, to submit to the electors thereof the following proposition:

"Shall bonds be issued and sold to the amount of $35,000 bearing four per cent interest per annum, for

the purpose of providing funds for the enlargement of and making additions to the present high-school building of Riverton in school district No. 25, in the county of Fremont and state of Wyoming, and to equip the same?"

Other detailed provisions were made in the resolution, which are not in question here, including the date of the election, the manner of voting, and that notice of the election should be given. The notice, provided by law, was duly given, and the election was duly held, with property owners voting separately, and the proposition submitted was carried by a large majority. A contract for the enlargement of the high school was thereafter let, at a cost of $31,000, and it is proposed, in accordance with the proposition submitted, to use the balance of the proceeds of the bonds, namely the sum of $4000, for equipping the building. Sale of the bonds was duly advertised according to law, the description of the bonds containing the clause that they would bear interest at "4% per annum payable annually and maturing between December 1, 1938 and December 1, 1955." On the date when the bids were to be opened, namely, December 19, 1935, the board of trustees of the district adopted a resolution that it "will sell the bonds of said district as heretofore advertised in the amount of $35,000, bearing interest at not to exceed 4% per annum, payable semi-annually, and maturing at the rate of $1000.00 per year, commencing Dec. 1st, 1938 to and including Dec. 1st, 1952, and of $2000 per year from Dec. 1st, 1953 to and including Dec. 1st, 1962," making $2000 due and payable 26 years, and $2000 due and payable 27 years after their date. Bidders were given the right to amend, change or withdraw their bids in view of the change made by the board. All bidders, however, consented thereto in writing, and the highest bid received was $1005.73 for each $1000 bond, bearing interest at

3½ per cent per annum, payable semi-annually, the bonds to be due in accordance with the last resolution of the board above mentioned. The bonds at that rate were awarded to the First National Bank of Riverton.

The indebtedness of the school district existing at the times above mentioned, after subtracting $11,846.12 in the treasury for the retirement of bonds, was the sum of $61,153.88. The assessed valuation of the property of the district according to the last preceding assessment rolls was $1,883,613.70, two per cent of which would be $37,676.27, and six percent of which would be about $112,000.

1. The contention is made by appellants that the election was void, because neither the constitution nor the law permits, in a case like this, the expenditure of any of the money for "equipment." Under the original Section 5 of Article 16 of the Constitution, a school district was authorized to issue bonds only to the extent of two per cent of the assessed valuation of the property of the district. In 1920 it was amended by a vote of the people, by inserting in the section the following:

"and provided further, that any school district may be authorized to create an additional indebtedness, not exceeding 4 per centum on the assessed value of the taxable property therein as shown by the last preceding general assessment, for the purpose of the erection or enlargement of school buildings therein."

The statute following out the section preceding the amendment to the constitution reads as follows: (Sec. 99-1001, R. S. 1931)

"The board of school trustees of any school district may, whenever a majority thereof so decide, submit to the electors of the district the question whether the board shall be authorized to issue the coupon bonds of the district to a certain amount, not to exceed two per

cent. of the taxable property in said district, and bearing a certain rate of interest, not exceeding six per cent. per annum, and payable and redeemable at a certain time, not exceeding twenty-five years, for the purpose of building one or more school houses in said district, and providing the same with necessary furniture, and funding outstanding indebtedness evidenced by warrant or otherwise, against said district."

The statute following out the amendment to the constitution above mentioned, enacted in 1921, and now embodied in Section 99-1002, is as follows:

"The board of school trustees of any school district may, whenever a majority thereof so decide, submit to the electors of the district the question whether the board shall be authorized to issue the coupon bonds of the district to a certain amount, not to exceed four per centum on the assessed value of the taxable property therein as shown by the last preceding general assessment, and bearing a certain rate of interest, not exceeding six per centum per annum for the purpose of the erection or enlargement of school buildings therein, which said indebtedness may be incurred and said bonds issued in addition to those provided for in §99-1001."

It will be noticed that neither the constitutional amendment above mentioned, nor the statute enacted pursuant thereto, specifically authorizes the issue of bonds for the purpose of *equipping* a school house. The question is whether that power is implied. We mentioned the subject, without deciding it, in the case of Hendricks v. School District, 44 Wyo. 204, 10 P. (2d) 970. We showed that South Dakota holds that such power is not implied. We also quoted from a number of other decisions holding the contrary upon the theory that a grant of power includes everything necessary to carry it out. See also 56 C. J. 477, 579; Lincoln Parish etc. v. Bank, 133 La. 109, 62 So. 492; Midland etc. School Dist. v. Central Trust Co., 1 F. (2d) 124 (Court

of Appeals). And we concluded in the Hendricks case by saying that "power to erect a school house should ordinarily, doubtless, be held to include power to put into it the necessary equipment, such as desks, boards, etc.," and heating plant. The term "equipment" is broad, and may include articles which are attached to the building as an integral part thereof, as well as articles not belonging to that category. Midland etc. School District v. Central Trust Co., supra. In Hudgins v. School District, 312 Mo. 1, 278 S. W. 769, 771, and Maxcy v. Oshkosh, 144 Wisc. 238, 128 N. W. 899, 912, 1136, 31 L. R. A. N. S. 787, the court seemed to think, although that is not certain, that the power to erect or enlarge a building includes the power to equip it with all necessary things, whether permanently a part of the building or not. In Board v. Malone, 179 N. C. 110, 101 S. E. 552, 553, the holding is confined to the fact that power to erect a building includes the power to equip it with all necessary things which permanently become a part thereof. What we said in the Hendricks case in that respect is confined to what was said in the North Carolina case, without going into details. We need not go further than that now. Every school building, or an enlargement thereof, requires some equipment which becomes part of the building, and we think that the better authority is to the effect that power to erect or enlarge a building should be construed as impliedly and necessarily including equipment of that nature, and we so hold. We must presume in the absence of a showing to the contrary—and none appears—that the people and the school board meant to include only equipment ·which can lawfully be bought and installed with money raised by the bonds for the principal purpose of erecting or enlarging a school building. The bonds issued pursuant to such lawful purpose can not be affected by the fact that the board of trustees might thereafter, without participa-

tion by the bond-holders, use part of the money for purposes which might not be lawful. 56 C. J. 628; Jones, Bonds & Bond Securities, Sec. 381. The objection, therefore, here under discussion must be overruled. We might add, in order to make our position clear, that this opinion should not be construed as holding that bonds can be issued for equipment alone. If it is not put in as part and parcel of the building when the "erection" or "enlargement" of the latter takes place, it would be in the nature of repair, and we find no statute or constitution in a case of this kind which authorizes the issuance of bonds for repair.

2. It is further claimed that the election was void for the reason that the proposition submitted to a vote of the people did not contain any reference as to when the bonds should become due and that they cannot be made to be due for a longer period than 25 years. The latter question, namely, that bonds cannot be made due for a longer period than 25 years, is a difficult one. Section 99-1002, Rev. St. 1931, makes no specific reference thereto. It seems, however, that in every case in which bonds by subdivisions in the state are authorized, a definite period of time within which they shall become due has been provided by the legislature, and it would seem that the legislature could hardly be held to have intended by Sec. 99-1002, supra, to give absolute discretion to the board of trustees in that respect. It is not the policy of the law, nor is it just as a matter of fact, that the present generation should so burden the future generations as to make the amount of taxation unbearable. Arnold v. Bond, 47 Wyo. 236, 34 P. (2d) 28. In State ex rel. v. Claussen, 126 Wash. 90, 217 Pac. 712, the court said:

"The legislature has, without doubt, discovered the fallacy of the too prevalent idea that municipalities may borrow indefinitely without thought of the day of payment, leaving future generations to assume the

burden of our improvidence and by this enactment has sought to correct a popular evil, the dire consequences of which the taxpayers are beginning to feel and to bring home to those responsible some sense of their obligation to pay."

Section 90-102, Rev. St. 1931, contemplates that a definite period of time has been fixed by law in all cases. Section 99-1002, supra, states that the indebtedness incurred under that section should be in addition to that in the preceding section. The only vital change made in the constitutional amendment above mentioned, and in Sec. 99-1002, supra, is as to the amount—increasing the basis of the bonds from 2% to 6% of the taxable value of the property in the district, and it would, therefore, seem that we should construe Sec. 99-1001 in *pari materia* on this point, to the effect that bonds cannot be made due later than the period of 25 years after they are issued. And we so hold. That holding does not, however, determine the point as to whether or not the question submitted by the people should have included the provision that the bonds should not run longer than that period of time. It was held in State ex rel. v. School District, 15 Mont. 153, 38 Pac. 462, that it should be. The law passed on reads like our section 99-1001, supra. We need not determine whether the holding in that case is correct, since section 99- 1002, supra, seems to contain definite provisions as to what the proposition submitted to the electors shall contain. It provides that the question to be so submitted shall be "whether the board shall be authorized to issue the coupon bonds of the district to a certain amount * * * and bearing a certain rate of interest, not exceeding six per centum per annum, for the purpose of the erection or enlargement of school buildings." The section in other words, provides that the people shall pass upon (a) the amount of bonds, (b) the maximum amount of interest to be paid, and

(c) the purpose for which the bonds are to be issued. We think that those specific provisions should control, where the election is held solely, as in this case, under Sec. 99-1002, supra. The point, if doubtful at all, is rendered so by reason of the existence of Section 99-1001, supra, and while it is true that there is no reason to say why the proposition submitted under either of these sections should be different, still Sec. 99-1002 is a much later law than the preceding section, and the legislature in 1921 evidently did not consider the point mentioned of great importance, so far as the election by the people is concerned. And that is definitely shown by section 99-517, Rev. St. 1931, enacted during the same session as Sec. 99-1002, supra. It provides for bonds to be issued by a high school district for a period of 25 years or less, and then prescribes that the question to be submitted to the people shall be: "Shall bonds be issued and sold to the amount of $------------------ bearing ----------- per cent of interest, for the purpose of purchasing school lot and building a school thereon and equip the same?" Nothing as to the maturity of the bonds is there required to be contained in the question to be submitted to the electors, and the legislature probably felt the same way in connection with the proposition to be submitted to the electors under Sec. 99-1002. It is a general rule that matters not required by the statutes need not be stated in the notice. 56 C. J. 596. And we hold that in this case the statute does not require that the maturity of the bonds shall be stated in the proposition submitted to the electors, and the contention to the contrary must, accordingly, be overruled.

3. We come, then, to the remainder of the proceedings subsequent to the election by the voters. The board of trustees of the district advertised the bonds for sale, as is required to be done by section 99-1004,

Rev. St. 1931. The bonds were described therein as bonds in the amount of $35,000, bearing interest at 4% per annum, payable annually and maturing between December 1, 1938 and December 1, 1955, each of the denomination of $1000. Bids were called for to be opened December 19, 1935. On that date the board passed a resolution, as already stated, changing some of the terms of the bonds, namely, that the bonds should bear interest at not to exceed 4% per annum, payable semi-annually, and that $1000 of the bonds should mature each year, commencing December 1st, 1938, to and including December 1st, 1952, and that $2000 of the bonds should mature each year from December 1st, 1953, to and including December 1st, 1962. Two thousand dollars of the bonds were, accordingly, to mature 26 years after issuance, and $2000, 27 years after issuance thereof. We have already held that the bonds must all mature within the period of 25 years, and the maturity of the bonds as proposed in the last resolution of the board is, therefore, void, at least as to the maturities in the last two years. 44 C. J. 1222; Jones, supra, Sec. 234. We do not, however, think that the bonds would be void merely by reason of the fact that the advertised notice stated the rate of interest to be 4% per annum, payable annually, when in fact they were sold at interest of $3\frac{1}{2}$ per cent per annum, payable semi-annually. The authorities seem to hold that, in the absence of a statutory provision to the contrary, it is in the discretion of the board to make the interest payable annually or semi-annually. 44 C. J. 1223; McQuillin, Municipal Corporations (2nd Ed.), Sec. 2431. The greater includes the less. Courts are not now as strict as formerly, in connection with the validity of bonds, when a change is made by the board of trustees in favor of the tax-payer. Thus it is said in 1 Jones, supra, Sec. 209, referring to a change to a lower amount:

"The trend of modern authorities, however, is away from such a strict interpretation of the statutory requirement and reason would seem to dictate that if the officers whom the voters of a municipality have selected to represent and conduct their interests can, in the exercise of a wise discretion and good business judgment * * * save money for them by accomplishing the desired object for a smaller sum than was authorized, the authorities ought to be allowed to exercise such discretion."

The principle here stated applies in the case at bar. And it specifically held that bonds need not be issued at the maximum rate of interest allowed (44 C. J. 1208) and that "the validity of municipal bonds will not be affected by the fact that they provide for interest at a lesser rate than that which they are authorized to bear." 44 C. J. 1221; McQuillan, supra, Sec. 2431. We think that First National Bank v. City of Laramie, 25 Wyo. 967, 168 Pac. 728, substantially disposes of this point, contrary to the contentions of appellants. The court among other things said therein that "no tax payers should complain because his agents have made a better bargain for him in the matter of interest to be paid than he had expressed his willingness to pay." Interest at $3\frac{1}{2}$ per cent per annum, payable semi-annually, is much more favorable to the debtor than 4% per annum, payable annually. We cannot, accordingly, hold that the bonds in question are invalidated by reason of the change in interest so made.

4. It is alleged in the petition that on December 19, 1935, before the bids for the bonds were opened, the trustees in the presence of the agents of the bidders and with their consent adopted a resolution granting to the First National Bank of Riverton an opportunity to meet the high bid and purchase the bonds for that figure if desired; that the board then opened the bid

and Oswell F. Benwell was found to have submitted the high bid, he offering to pay $1005.73 for each $1000 bond bearing interest at 3½% payable semi-annually. That thereupon the First National Bank, which had offered $1000 for each $1000 bond bearing interest payable semi-annually, raised its bid to the highest made, and was awarded the bonds. Such proceeding is not to be commended, and might result in the invalidity of the sale, for it would have a tendency to prevent any outside bids, and thus lead to great detriment to the tax payers. We find, however, that Sec. 99-1004, Rev. St. 1931 contains a provision that the school district may reject any and all bids—a provision contained in the notice of sale of the bonds—and that thereupon the board may sell the bonds at private sale, if they deem it for the best interest of the district—a provision which has the same tendency to prevent bids as the procedure adopted in the case at bar. In fact the course pursued herein, though the manner differed somewhat, in effect was the same as that authorized by the statute, so that it would seem that, in face of the absence of a showing of detriment to the tax payers, the course adopted was but an irregularity, and irregularities not involving any detriment to the tax payers do not invalidate the sale of bonds. 56 C. J. 628. In the case of Parks v. School District, 22 Ariz. 18, 193 Pac. 843, it was said:

"I do not overlook an indirect reference in the complaint to the point that some secret combination of the school district officers is supposed to have been formed for the purpose of selling the bonds when ready for sale, at a private sale and without competitive bidding, for private gain. This, if true, would not invalidate the bonds; but a sale of the bonds in such circumstances would be questionable. The question was not seriously pressed by the appellant and we presume the officers will not violate the law."

We need not approve all that was said in the above quotation. In the case at bar, it is neither alleged nor shown, and the circumstances prevent a suspicion, that the board of trustees adopted the course herein taken for the purpose of any private gain. It would seem that they simply thought that the issue of the bonds would be more readily handled through a local bank. All the bidders consented to the arrangement previous to the opening of the bids, and evidently thought the same as the board. Under these circumstances we do not think that the course adopted should invalidate the bonds.

5. It is contended that the bonds to be issued should mature substantially in an equal amount each year. Prior to the enactment of a law in 1929, hereinafter mentioned, we find no provision relating to school bonds which specifically refers to the maturities of such bonds, provided that they are all made to mature within 25 years. Nor do we find anything specifically in regard to the denominations thereof and several other matters. Section 99-1003 provides that "the board of trustees must issue such bonds in such form as the board may direct." It would seem, that in view of the absence of legislation above mentioned, the matter of maturities (within 25 years) was, under the quoted provision of Sec. 99-1003, specifically delegated to the board, and that the legislative will is supreme, if within constitutional limitations, cannot, of course, be doubted. It has been held, under a similar statutory provision as that above mentioned, that the question of denomination is left to the board, even though voted on by the taxpayers. Santa Barbara v. Davis, 6 Cal. App. 312, 92 Pac. 308. It appears in that case that the statute provided that "the bonds shall be issued in such denomination as the legislative branch of the municipality may determine"—to be not less than $100 and

not more than $1000. The ordinance for the election specified that the bonds should be of the denomination of $1250 each. It was held that this matter could be corrected by the board subsequently. The court said among other things:

"The presence of the clause (as to the denomination of $1250) in the ordinance being unnecessary and unauthorized, it is clearly surplusage, and does not operate to limit or affect the exercise of the discretion to fix the denomination of the bonds conferred upon the council by Sec. 5 of the act. It cannot be said that the question as to the denomination of the bonds was submitted to the voters at the special election, as this is not made a part of the proposition printed on the ballot, but had such an attempt been made, it would have been an unauthorized delegation of legislative discretion expressly vested by law in the city council."

In City of Oxnard v. Bellah, 21 Cal. App. 33, 130 Pac. 701, 703, it is said:

"Finally it is claimed by respondent that the bonds offered differed from those described in the ordinances. This difference is only in relation to the time when the bonds and interest thereon are made payable—a matter not material or necessary to be included in the call for election or other preliminary ordinances. It is a matter for the determination by the board of trustees, after authority to issue is given. City of Santa Barbara v. Davis, 6 Cal. App. 342, 92 Pac. 308."

No law, accordingly, so far considered sustains the contention of counsel for the plaintiffs. They point out, however, an enactment by the legislature in 1929, now known as Sec. 90-102, Rev. St. 1931. That section reads as follows:

"Whenever the issuance of bonds by the state, or any county, city, town, school district or high school district, may be lawful, the board or other public body having authority to issue such bonds may at their discretion, divide such issues into series so that substan-

tially equal amounts of the indebtedness shall mature annually, the bonds of each such series being made due and payable at a definite date within the period permitted by law for the discharge of such indebtedness."

It will be noted that aside from the provision that the bonds must be made payable within the period provided by law, the act is not mandatory, but leaves the matter to the discretion of the board of trustees, or other public body. It does not seem to modify the power given the board by Section 99-1003, and in any event does not sustain the contention of plaintiffs. The act seems to apply to bonds issued in series, whether authorized by the vote of the people at one election or more. State ex rel. v. Thompson, (Mo.) 36 S. W. (2d) 109. Serial bonds are bonds issued in a series of which parts are redeemable at different specified dates. Webster's International Dict. (2nd Ed.) ; Fales v. Multnomah County, 119 Or. 127, 136, 248 Pac. 151. Such bonds seem to be opposed to "term bonds,"—the latter presumably bonds which all come due at a definite date. Plainfield v. Comm'r., 92 N. J. L. 84, 105 Atl. 457. The term "serial bond" does not, by its definition, include the meaning that they must all be of the same denomination and due equally in each year. But that end, as near as may be, is sought to be brought about by Sec. 90-102, supra. A literal compliance is substantially impossible, except where there is only one issue of bonds, or, perhaps, when two or more series are issued in the same year. The difficulty is pointed out in State ex rel. v. Clausen, 126 Wash. 90, 217 Pac. 712. In case different series are issued in different years, it is often impossible to comply with the statute even "substantially." The Washington statute contains the clause "as near as practicable," and that should be read into our statute. In this case, the school board involved herein appears to have attempted to comply with the law in question in that sense, as near as may be, so

as to distribute the tax burden—one of the purposes of such enactments—as nearly equally over the period from now on until the last of the present series matures. We can see no objection to such an arrangement, provided that a change is made to the extent that the total present issue is made to mature within not more than 25 years. This could easily be effected by—for example—changing the last four maturities to $3000 instead of $2000 per annum.

6. The question then remains as to whether the sale of the bonds here involved should be re-advertised. There would seem to be no purpose in doing so, unless that would, or might, result in benefit to the district, and whether it would or might do so should be left to the discretion of the board. There is no special reason to believe that the failure to advertise that the interest would be payable semi-annually instead of annually, as the notice stated, would or might have that effect. All the bids submitted were on the basis that interest should be payable semi-annually, and that is the usual practice. The fact that a change must be made in the maturities of the bonds, so as to make the total issue due within 25 years, would not necessitate re-advertisement, since the statute requires the issue to be made so due, and would, in view of the law, presumably be made for the benefit of the district. Nor do we see any other reason why re-advertisement should be required. There exists, however, no binding contract between the parties, in view of the one change which must necessarily be made. Hence the board of trustees have a right to re-advertise the sale of the bonds, if it wishes to do so, and the purchaser will not be required to accept the bonds under his present bid. If, however, the proper change can be made by agreement of the parties, and a proper resolution to that effect is adopted by the board, we can see no reason why, with

such change, the sale may not be completed under the bid heretofore made, making re-advertisement in that event unnecessary.

The judgment of the trial court is reversed for the error here pointed out, and the cause is remanded for further and supplementary proceedings, if desired, not inconsistent with this opinion.

*Reversed and remanded.*

KIMBALL, Ch. J., and RINER, J., concur.