G. L. BRYANT, Plaintiff and Appellant, v. The BOARD OF EXAMINERS of the STATE OF MONTANA, et al., Defendants and Respondents.

No. 9700.
Submitted November 16, 1956.   Decided December 7, 1956.
305 Pac. (2d) 340.

Mr. Wesley W. Wertz, Helena, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., and Mr. Robert L. Word, Jr., Spec. Asst. Atty. Gen., for respondents.

Mr. Wertz and Mr. Word and Mr. Olsen argued orally.

MR JUSTICE DAVIS:

The appellant Bryant, a taxpayer, brought this suit in the district court for Lewis and Clark County to enjoin the issuance and sale by the State Board of Examiners of certain bonds under chapter 278, Laws of 1955, and for a declaratory judgment that the proposed bond issue was invalid. The purchaser of these bonds is joined as a defendant. The lower court denied the plaintiff injunctive relief, and entered judgment for the defendants. This appeal by the plaintiff taxpayer followed.

Hereafter we shall refer to the appellant as the plaintiff, to the respondents as the defendant Board.

Chapter 278 in terms authorizes the State Board of Examiners to issue and sell bonds in an amount not exceeding $750,-000, the ''proceeds of which are to be used solely for the purpose of reconstructing and renovating the state capitol building including roll call voting machines in the house of representatives chambers at Helena, Montana.'' See chapter 278, section 1, Laws of 1955.

Section 7 of this chapter, where is found the crux of the controversy before us, so far as presently material reads:

''The principal and interest of the bonds authorized by this act shall be payable out of the following fund and from it only: All the income received from the capitol [sic] building land grant, shall be, and the same is hereby perpetually dedicated and appropriated for the payment of the principal and interest of the bonds provided for by this act. * * *''

This pledge of the income from the capitol building land grant is valid only if the purpose for which these bonds are to be issued falls within the provisions of sections 12 and 17 of the Enabling Act, by which the United States granted the State of Montana certain lands for the purpose of erecting public buildings at the state capital. More narrowly stated: Chapter 278 and the pledge of the income from the capitol building land grant which section 7 of that statute con-

514

templates may be sustained only if "reconstructing and reno-
vating" the state capitol building and installing roll call vot-
ing machines in the house of representatives' chambers is a
purpose as stated in section 1 of that chapter which is compre-
hended by sections 12 and 17 of the Enabling Act. The pre-
cise language of these latter sections and their meaning are
then of importance.

By section 12 the United States gave Montana fifty sections
of land "for the purpose of erecting public buildings at the
capital of said states [Montana] for legislative, executive and
judicial purposes." By section 17, which follows, the state is
given one hundred and fifty thousand acres "for public build-
ings at the capital of the state, in addition to the grant here-
inbefore made for that purpose," etc.

The phrase "hereinbefore made for that purpose" found in
section 17 obviously refers to the purpose expressed in
section 12, and fairly read can not be construed otherwise.
Sections 12 and 17 of the Enabling Act on their face are to be
read and applied as in *pari materia* the one with the other,
constituting together what amounts to one section dealing with
a single subject. Compare Putnam v. Putnam, 86 Mont. 135,
141, 142, 282 Pac. 855. Each grants Montana unappropriated
public lands for precisely the same purpose, viz., for the pur-
pose of "erecting public buildings at the capital". Whatever
these words may be taken to mean as applied to the controversy
before us, the purpose of the grant under section 17 can be given
no broader or different effect than that expressed in section
12; and section 12 is precise in the statement of that purpose,
which it seems could not have been made plainer.

Indeed chapter 278 clearly shows by the language used there
that the legislature itself in enacting that chapter was of the
opinion sections 12 and 17 of the Enabling Act are to be read
and applied as though they were integrated parts of the same
section; for section 7 of chapter 278 makes no distinction be-
tween the income on the one hand accruing from the lands
granted under section 12 and on the other the income coming

from the additional lands which Montana takes under section 17. The income derived from both grants is mingled indiscriminately in section 7 to make up a common fund pledged in its entirety for the payment of the bonds mentioned in section 1 of that chapter.

Necessarily then the converse is also true that the limitation in section 17 of the Enabling Act upon the use of the lands granted by that section must be read as well with section 12; i.e., the restriction found in section 17 that the "lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned," etc., applies also with equal force to the lands which Montana takes under section 12. As to all these lands Montana takes title as does a trustee of an express trust, charged with the duty of devoting the trust property both the corpus and the income to the purpose specified in the instrument (here the Enabling Act) by which the trust is created. Hence the purpose of the bond issue for which chapter 278 provides must be the erection of public buildings as section 12 of the Enabling Act specifies, and no other; or the pledge of the common income from the lands granted under sections 12 and 17, which section 7 of chapter 278 recites, is invalid.

Adopting this construction of the Enabling Act the plaintiff has specified six errors in the judgment of the court below, three of which fairly present for decision the question whether reconstructing and renovating the state capitol building and installing roll call voting machines in the house of representatives' chambers, which is the declared purpose of chapter 278, constitutes the erection of a public building. The district court answered this question in the affirmative, and ruled that chapter 278 was consistent with the Enabling Act. This was, we think, error.

At the outset we heed the command of R.C.M. 1947, section 19-102, to construe the words and phrases found in the statutes before us "according to the context and the approved usage of the language" we find there. For in these statutes

516

no technical terms are used, which have acquired any peculiar meaning or definition apart from that ordinarily conveyed by what we read. Our task is limited accordingly to the construction of simple English in which there inheres neither uncertainty nor ambiguity; or so it seems to us.

"To reconstruct" means "To construct again; to rebuild; to remodel; to form again or anew; * * * as to *reconstruct* a church, * * *"

"To renovate" means "To renew, make over, or repair; * * *" See Webster's New International Dictionary (2d ed.): "reconstruct"; "renovate". Compare Funk and Wagnall's New Standard Dictionary: "reconstruct"; "renovate".

Paraphrased then section 1 of chapter 278 when construed according to the context means that the proceeds of the sale of the authorized bonds shall be used solely for the purpose of remodeling and repairing the state capitol building which is now an existing structure, and specifically also for the installation in that already completed building of roll call voting machines in the house of representatives' chambers. This construction accords not only with the context of chapter 278, but with the approved usage of the language also found there. Moreover, no other construction can be put upon that language which fairly fits either that context or the particular words which the legislature employed to express the purpose of the act. Conversely we note here that "to repair" is defined by Black's Law Dictionary (4th ed.) as "To mend, remedy, renovate, to restore to a sound or good state after decay, injury, dilapidation, or partial destruction."

More particularly, insofar as chapter 278 concerns itself with renovating the state capitol, it is to be taken certainly as a statute providing for the repair of that building, and nothing more. See Mozingo v. Wellsburg Electric Light, Heat & Power Co., 101 W. Va. 79, 81, 82, 131 S.E. 717; Sharp v. Quincy, O. & K. C. R. Co., 139 Mo. App. 525, 530, 531, 123 S.W. 507. And as used in this statute in the conjunctive the words "reconstructing" and "renovating" taken together can mean only

the rebuilding or remodeling and repair of the state capitol building which has already been erected as that word is commonly understood, which is now standing, and in which as a part of the remodeling or repair to be undertaken there are to be installed certain roll call voting machines. It is contended by no one at bar that chapter 278 comprehends the rebuilding or reconstruction of a new capitol building from the ground up, or that the existing structure is to be torn down and a new building erected on its site, or that when reconstructed and renovated consistent with chapter 278 the present state capitol will lose its identity and then be in any sense of the word a new or different building from that which we now have. The context of chapter 278 belies any such construction; and as we read the record before us against the language of the statute we conclude no one would rationally put any such construction upon that language.

The pivotal issue then which we must decide here is thus resolved into this short inquiry: Does the rebuilding or remodeling and repair of the existing state capitol at Helena for which chapter 278 provides constitute the erection of a public building fairly within the sweep of sections 12 and 17 of the Enabling Act? We think the weight of authority answers this inquiry in the negative.

The usual and ordinary meaning of the verb "to erect," as it is used in section 12 of the Enabling Act, is "To raise, as a building; to build; construct; as, to erect a house." See Webster's New International Dictionary (2d ed.): "erect".

In State ex rel. King v. Lothrop, 55 Nev. 405, 36 Pac. (2d) 355, 357, there were before the Supreme Court of Nevada for construction sections 1991, 1992, 1993, Nevada Compiled Laws. Section 1991 so far as material reads:

"In any county in this state, not at present supplied with suitable buildings for county purposes, it shall be lawful for the board of county commissioners of such county, to build or purchase, in their discretion, the buildings required."

The courthouse of Lyon County. Nevada, had been damaged

518

by earthquake such that it was unsuitable for county purposes. The commissioners of that county decided to repair and remodel, assuming authority to do so was conferred upon them by section 1991, supra. Accordingly they proposed the issuance of bonds as sections 1992 and 1993 permitted in the cases covered by section 1991.

The Supreme Court of Nevada held however that the repairing and remodeling of a courthouse was neither the building nor the purchase of such a structure, and therefore conferred no authority upon the county commissioners in the case at bar. "To build" is synonymous with "to erect". Webster's New International Dictionary (2d ed.), supra; Funk & Wagnall's New Standard Dictionary: "to erect"; Crabb's English Synonyms (cent. ed.); "build". Hence what the Nevada Court said in the Lothrop case is directly in point at bar:

"* * * The resolution of the board of county commissioners that Lyon County issue its general obligation bonds for the purpose of repairing and remodeling the county courthouse was beyond the power of the board and therefore void. * * * They [the statutes invoked] empower the commissioners of a county, when it is not supplied with suitable buildings for its purposes, to issue bonds in order to *build* or *purchase* the same. Whatever may have been the extent of the damage caused Lyon County Courthouse by the earthquake rendering it unsuitable for county purposes (and it appears from the petition that the damage is considerable), it is clear therefrom that the commissioners do not intend to build or purchase a building. It is proposed only to repair or remodel the present building and make an addition thereto."

We repeat, this reasoning has direct application to both the Enabling Act and chapter 278; for as we have noted the only purpose of chapter 278 is to rebuild or remodel and repair the existing capitol building. There is no purpose expressed in that chapter to erect or build a new structure. No fair reading of chapter 278 admits of the view that the reconstruction

and renovation of that building, which is but another way of providing for its repair and remodeling, constitutes erecting a public building within the meaning of the Enabling Act, which authorizes in its turn only the erection of a building as a new or substantially new structure.

In Board of Commissioners of Guadalupe County v. State, 43 N.M. 409, 94 Pac. (2d) 515, there was before the Supreme Court of New Mexico the validity of a proposed bond issue, the proceeds of which were to be used for the "purpose of *remodeling* the County Court House of Guadalupe County and *building an addition thereto.*" The only authority for this issue was to be found in article IX, section 10, Constitution of New Mexico, which authorized a county to issue bonds for the purpose of "erecting necessary public buildings." As at bar the question there presented for decision was whether remodeling an existing courthouse constituted erecting a courthouse. The Supreme Court of New Mexico held that it did not.

More specifically the New Mexico Court there said initially that " 'erecting' a courthouse and 'building' a courthouse mean the same thing. The terms 'erecting' and 'building' are of such similarity of meaning that it may be said that they *invariably* mean the same thing."

The court then added:

"In the common understanding of the people, when we speak of the building of a house we mean the erection or construction of a new house and not the repair or remodeling of an old one."

In summary the court concluded that "erecting" necessary public buildings, which the Constitution of New Mexico permitted, was not the same thing as repairing or remodeling an already existing building.

In Harrington v. Hopkins, 288 Mo. 1, 10, 231 S.W. 263, the Missouri Supreme Court had before it for construction section 11, article X, of the Constitution of that state, which authorized an increase in the rate of taxation in certain cases for the "purpose of erecting public buildings." The Missouri Court was

emphatic in saying: "In no sense can the words 'furnishing' and 'repairing' be construed to mean the 'erection of public buildings,' as those words are used in the Constitution.

In Jewett v. School District No. 25, 49 Wyo. 277, 286, 54 Pac. (2d) 546, 547, the Supreme Court of Wyoming considered article XVI, section 5, of the Wyoming Constitution as amended, which authorized a school district under specified conditions to create an indebtedness "for the purpose of the erection or enlargement of school buildings therein." In the case then before it the Wyoming Court sustained the bond issue there challenged, but in doing so was careful to point out that "* * * we find no statute or Constitution in a case of this kind which authorizes the issuance of bonds for repair." Again the distinction is clearly drawn between the erection of a public building and the repair or reconstruction of a building already erected.

See also School District No. 6, Chase County v. Robb, 150 Kan. 402, 93 Pac. (2d) 905, 124 A.L.R. 879; Vollor v. Board of Supervisors of Warren County, 156 Miss. 625, 126 So. 390; City of Mayville v. Rosing, 19 N.D. 98, 123 N.W. 393, 26 L.R.A.., N.S., 120.

It follows that chapter 278 may not be sustained as a valid pledge of the income from the capital land grant, which is made up of the moneys received from the lands given the state to erect public buildings under sections 12 and 17 of the Enabling Act. These moneys may be used only to erect a building as those words are commonly understood; for the Enabling Act says just this and nothing more. They may not be used to rebuild or remodel and repair a structure already built and in use, which after reconstruction and renovation remains yet the same building as before. To reconstruct and renovate the existing capitol building is not to erect that building, unless the work designed amounts to the construction of what is a new and different building when completed. No one suggests that chapter 278 contemplates a new or different state capitol as the result of the reconstruction and renovation to

which that act points. We are convinced therefore for the reasons given that section 7 particularly of chapter 278 may not be given effect; for the income there pledged may only be used to erect a building and that is not the purpose specified in section 1.

This conclusion is challenged by counsel for the defendant Board, (1) because as they say it fails to heed the intention of the Congress in enacting the Enabling Act, which first became effective on February 22, 1889; and (2) because as they argue our interpretation of sections 12 and 17 puts such a literal construction upon these sections that the consequences to which that construction leads are absurd. We think their citation to the point here of Reeve v. City of Billings, 57 Mont. 552, 555, 189 Pac. 768, of United States v. Ryan, 284, U.S. 167, 52 S. Ct. 65, 76 L. Ed. 224, and of similar decisions does not bear out their criticism or sustain their position.

Specifically there is nothing in this record or in the history of the Enabling Act, so far as our search has led us, which indicates what the intention of the Congress was in enacting that statute; i.e., save insofar as the congressional intent is to be found in the words used by the Congress in framing that statute. We have already indicated what in our view the text of sections 12 and 17 shows the intent of the Congress was in enacting these specific sections; and we find nothing anywhere, whether within or without the four corners of the act, which suggests that that conclusion, compelled as it is by the face of the statute, is at war with any congressional intent whatsoever, however manifested.

For us to say now that by the use of the word "erecting" the Congress intended to provide for repairing or remodeling the state capitol after its erection, whether because of damage done by earthquake or because of other like calamity, would be for us to find as a fact a congressional intent for which in fact there is no basis. On February 22, 1889, there were no public buildings at the capital of Montana to be repaired; for there was then as yet no state capital, or for that matter State

of Montana. Had the Congress in mind to provide for the renovation and reconstruction or repair of buildings thereafter to be erected when a capital for the state should be selected, it would have been easy for it to have said so. That it did not say so in plain English indicates for us the Congress entertained no intent to include reconstruction or remodeling and repair within the purpose expressed in the Enabling Act when it wrote in section 12 the word "erecting".

Nor do we find anything absurd in the so-called literal construction put here upon sections 12 and 17 of the Enabling Act, which leads to the conclusion that "erecting" does not include "reconstructing" and "renovating". It is not absurd to construe a statute to mean precisely what it says. Nor is it absurd for us to decline to work a judicial amendment of the Enabling Act by interpolating the words "reconstructing and renovating", or their synonyms, "remodeling and repairing".

In truth the argument made here by counsel for the Board, we think comes to this: Because as the Enabling Act was passed by the Congress it is on its face not broad enough to make available funds from the capital building land grant for the repair of the state capitol, they would have us amend it under the guise of judicial construction. This we are unwilling to do. Our conclusion not to do so is not absurd. The courts may not legislate. It is not absurd then for us to refuse to do so.

The plain duty enjoined upon us by the Montana Codes in the construction of a statute is that we shall only ascertain and declare what is in terms or in substance contained in that statute. R.C.M. 1947, section 93-401-15. Neither in terms nor in substance do we find in the Enabling Act authority for' the use of the land grant there made to Montana or of the income therefrom for the purpose which section 1 of chapter 278 defines. Much less in the Enabling Act do we find authority to pay out of the income from this grant the cost of installing voting machines in the capitol building long since erected and in every sense of the word now completed as such. For the

cost of such an installation provision should be made by a general appropriation. Of course an entirely different question would be presented, if this installation were to be made in the erection of a new building, of which these voting machines were in integrated part. Jewett v. School District No. 25, supra, 49 Wyo., at pages 283 to 286, 54 Pac. (2d) at pages 547 to 548; Board of County Commissioners of Bernalillo County v. McCulloh, 52 N.M. 210, 195 Pac. (2d) 1005.

The McCulloh case, cited by counsel for the Board, is not at war with the disposition we make of this appeal; for there the court was concerned with the erection of a new building. We have no such case at bar. Nor does that decision assume either to overrule or in any wise limit the earlier case in the same court of Board of Commissioners of Guadalupe County v. State, supra. We see nothing in this citation to aid the Board's case here.

In fairness however to the Board and its counsel we do recognize that support for the position they take is to be found in some of the language of the opinions written in Brown v. Graham, 58 Tex. 254; Cotter v. Joint School District No. 3, 164 Wis. 13, 158 N.W. 80; and Harrell v. Board of Commissioners of Wilson County, 206 N.C. 225, 173 S.E. 614, although upon their facts and in the light of the statutes construed, as we read these opinions, they do not appear in point; nor do they persuade us that the Board's construction of the statutes now in issue before us is sound. If we are wrong, however, to this point, and if these precedents are authority that the word "erect" may be construed to mean "erect and repair", it remains nevertheless that they are in the decided minority standing against what we conceive to be the weight of authority and as well opposed to the better reasoned decisions which we have noted. We do not think these citations presently pertinent upon their facts; but, if they are, we do not concede that they are sound. Accordingly we decline to follow them.

It is unnecessary to consider the other errors specified by

the plaintiff in his brief; for what we have already written disposes of the whole case.

The judgment of the district court is reversed with directions to enter a judgment for the plaintiff taxpayer and to award him appropriate injunctive relief not inconsistent with the views herein expressed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE ANGSTMAN: (dissenting.

I concede that the words ''reconstructing and renovating the state capitol building'' as used in chapter 278, Laws 1955, mean the rebuilding, remodeling and repair of the building already constructed or erected as held in the majority opinion. I do not agree however that the income from the land grant may not be used for those purposes.

The Enabling Act, like our codes, must be liberally construed with the view of accomplishing the object sought to be attained. R.C.M. 1947, section 12-202. And the intention of the lawmakers in enacting the Enabling Act must be pursued if possible. R.C.M. 1947, sections 93-401-16, 43-511.

Sections 12 and 17 of the Enabling Act were for the purpose of erecting buildings to be used for executive, legislative and judicial purposes. I think there is implied authority to use the income from the land grant to repair a building already erected. In other words there is implied authority to keep the building erected or constructed. Our attention has not been called to any case involving a grant of lands for the purpose of erecting buildings for governmental purposes that holds it may not be used to repair a building already constructed. All the cases relied on in support of the majority opinion are cases in which the proposed bonds were payable by tax levies.

In those cases there was involved the principle that bonds may not be issued payable from tax levies unless the authority to issue the bonds is expressly conferred. The authority will

not be drawn by implication. In such cases statutes conferring authority are strictly construed and no authority or power will be implied.

But even in such cases there is a division of authorities on the subject and some courts hold that the authority to erect a building, even under the strict construction rule, will permit the issuance of bonds for the purpose of repairing a building already constructed.

Thus in Brown v. Graham, 58 Tex. 254, the court in speaking of this said:

"Should the commissioners' court come to the conclusion that a larger court house is needed to meet the demands of the public business of their county, and they agree upon its plan and dimensions, and find that they can secure a building conforming to them in every respect, either by erecting a new structure, or altering, repairing and enlarging the old one, and the latter mode will be less expensive by half than the former, is there any reason in holding that they can levy the tax for the more expensive mode of attaining their object, when they could not by the other, though the structure which is the result is precisely the same in every particular?

"The object of the foregoing provisions of our constitution and statutes was to enable the diferent counties to provide suitable public edifices, leaving it to the judgment of the proper authorities whether this would be done better by building new edifices or by repairing and adding to old ones, when they could thus be rendered suitable to the purposes of the country. The word 'erect', contained in all the foregoing provisions, was the most comprehensive term that could be used to embrace all such improvements.

"To hold that a county whose court house, with proper repairs and additions, could be rendered commodious and useful in every respect, must pull it down and build an entirely new one, would be to charge our law-givers with an intent to encourage an unnecessary expenditure of the public money. Such a consideration would not, in itself, authorize us to infer a power

when not expressly given or necessarily implied. Yet when the language used is capable of including authority to do an act not mentioned in terms, such construction of it is greatly aided by considerations of public advantage which it would certainly produce.''

In Cotter v. Joint School Dist., 164 Wis. 13, 158 N.W. 80, it was held that authority to borrow money for the purpose of aiding in the erection or purchase of a schoolhouse was sufficiently broad to authorize the borrowing of money for the purpose of remodeling an existing schoolhouse and building an addition thereto.

In Harrell v. Board of Commissioners of Wilson County, 206 N.C. 225, 173 S.E. 614, it was held that the authority to levy taxes for the erection and purchase of schoolhouses included the power to repair and make additions.

The words "erect" and "construct" are synonymous. State ex rel. Davis v. Barber, 139 Fla. 706, 190 So. 809; State ex rel. City of Chillicothe v. Gordon, 233 Mo. 383, 135 S.W. 929; Butz v. Murch Bros. Const. Co., 199 Mo. 279, 97 S.W. 895. I think the authority to "erect" or "construct" a building for executive, legislative and judicial purposes by necessary implication carries with it the authority to keep the buildings in a proper state of repair so as to serve the purpose intended. Analogous cases treating of subjects other than buildings hold that the authority to construct confers implied authority to keep in repair.

In re Fowler, 53 N.Y. 60, in discussing the meaning of the word "construct" as used in an act authorizing the construction of a sewer, the court said:

"Nor do we think that the phrases 'to construct' and 'be constructed' are, in the purview of this act, to be confined to the bare act of building the sewer. Doubtless, to construct is, primarily, to form, to build together; and a power to construct may, in many cases, end when the work of building is done. But here the power to construct is the power to keep together as well as the power to put together, the power to maintain, pro-

tect and preserve, as well as the power to erect. The purpose or object of sewerage, upon a general plan for a city, is not temporary, and such a plan is for a long continued use and benefit. The works constructed for it must be afterward maintained, else the purpose fails.''

In First Nat'l Bank of Eutaw v. Smith, 217 Ala. 482, 117 So. 38, 40, the court had before it the question whether an act setting aside the ''gasoline fund'' to the ''construction, repair, and maintenance'' of a designated highway conflicted with the title of the act which authorized the use for ''construction'' only. The court held it did not, saying:

''* * * the *maintenance* of the roads and bridges, after their construction, is clearly germane to the purpose of the act, which is to supply the people with highways which are capable of continuous service. And, indeed, the authorities hold that, when authority or duty is imposed by law upon a governmental body to 'construct' any public work or utility, that term includes also the duty of *maintenance* and *protection*—of keeping it constructed by means of necessary repairs.''

To the same effect is Town of Pelham v. The B. F. Woolsey, 16 F. 418, 421, where the court said:

''In the present case, it may be said, it is true that, strictly, the maintenance of this dock, or the power 'to keep and maintain the same in good repair at the expense of the town,' is not identically the same as 'constructing the dock' spoken of in the title. No one, however, could imagine that the dock was to be abandoned by the town the moment its original construction was completed. Subsequent repair is necessary in the nature of the case; and authority to construct the dock would, therefore, in a general sense, seem to imply and include the power to keep it constructed by means of necessary repairs.''

In Bell County v. Lightfoot, 104 Tex. 346, 138 S.W. 381, 382, the law authorized a bond issue for ''purchasing or constructing bridges for public purposes.'' A bond issue was proposed for ''repairing bridges''. The issue was sustained, the court saying:

"The Attorney General objects that the statute under which the right to issue the bonds is claimed does not empower the county to issue bonds for the purpose of repairing bridges. We think it well settled that the authority to construct bridges for public purposes embraces the repair and maintenance of such structures."

In Board of County Com'rs of Bernalillo County v. McCulloh, 52 N.M. 210, 195 Pac. (2d) 1005, 1009, it was held that the authority to "erect" a building carries the implied power to purchase a site and to equip the building so that it can be used for the purpose for which it was built. A long list of cases are therein cited in support of the rule that the power to erect a building implies the power to purchase the necessary land on which to erect it. I think the implied power to repair a building already erected is not as far-fetched as the implied power to purchase a site on which to erect the building for, strictly speaking, the purchase of land is not the erection of a building.

When we construe the Enabling Act liberally with the view of giving effect to the purpose of providing a building for executive, legislative and judicial purposes, I have no difficulty in concluding that the authority to repair an existing building exists by implication.

I see no difference in principle between this case and one where money is placed in trust by A for the purpose of erecting a building for use by A's son and family as a home. Certainly as long as there was money in the trust it could be used to keep the building in a reasonable state of repair so that it served the purpose intended by the grantor.

As to the roll call voting machine, I think it is authorized as a part of the equipment of the building. In Board of County Commissioners of Bernalillo County v. McCulloh, supra, the court said: "The courts are, with one exception, unanimous in holding that there is implied power to equip public buildings where power is given to erect them." Many cases are there cited to support the statement.

The court then pointed out in that case that there is a difference of opinion among the courts as to the character of equipment contemplated. Some authorities limit the equipment to such as becomes a part of the building while others hold that the power to erect a public building includes the implied power to furnish and equip it so that it can be used for the purpose for which it is erected.

A common sense view of this question was taken by the Supreme Court of Missouri in Hudgins v. Mooresville Consolidated School Dist., 312 Mo. 1, 278 S.W. 769, 771. There the Constitution authorized taxation for the purpose of erecting school buildings, without making any reference to furniture or equipment. It was contended by appellants that there was no authority to equip the building under the constitutional provision. The court, in holding that the contention was without merit, said:

"It has often been held here and elsewhere, not only in the construction of statutes, but Constitutions, that they should be so construed as to aid and effectuate the purpose of their adoption. This beneficient and wholesome rule would cease to be applicable if the section be construed as contended by appellants. It would authorize the erection of a building, but leave it empty as the House of Usher, and thus defeat the purpose of its erection. Goode, J., in an illuminating opinion in State ex rel. Wahl v. Speer, 284 Mo. 45, 223 S.W. 655, held, in effect, that the language of the Constitution (Section 11, Art. 10), which authorizes an increase in the indebtedness of a county for the erection of a courthouse, means, not only that the money so voted can be used to construct the courthouse, but also to acquire a site for it; the rule of interpretation being that a power granted carries with it, incidentally or by implication, powers not expressed, but necessary to render effective the one expressed, and that a courthouse cannot be erected without a site. By parity of reasoning, while a school building may be erected without equipment, the latter is vitally necessary to its use, and without the same its erection would be futile and the purpose of its erection a useless formality."

530

This language was quoted with apparent approval by the Wyoming Supreme Court in an opinion by Mr. Justice Blume in Hendricks v. School Dist. No. 1, 44 Wyo. 204, 10 Pac. (2d) 970.

It is unnecessary in this case to determine whether we would go so far as to hold that the power extends to furnishing the building. Here the equipment becomes a part of the building as much so as desks in a schoolroom which are fastened to the floor. The equipment here is much the same as the electric wiring which goes into a modern building, taking the place of the kerosene lamp. Likewise I believe equipment may be added to a building already constructed to meet the needs of a progressive society. Arps v. State Highway Comm., 90 Mont. 152, 300 Pac. 549.

I have considered other questions raised by these proceedings but find nothing upon which to reverse the action of the trial court. It should be noted that the grantor—the United States —is not complaining of the use made of income from the land grant.

I think the judgment should be affirmed.